THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:

DATED: March 25, 2020



G. Michael Halfenger
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

    Judith A. Engelman,                         Case No. 18-26174-gmh
                                                                   Chapter 13

    Debtor.

**DECISION ON YORK INVESTMENT LLC'S MOTION TO DISMISS**

Judith Engelman commenced this case by filing a voluntary petition under chapter 13 of the Bankruptcy Code. York Investment LLC filed a proof of claim for nearly $1.4 million owed on a promissory note, fully secured by a mortgage on Engelman's real property. York then moved to dismiss the case asserting that Engelman is not eligible to be a debtor under chapter 13 because, when she filed her petition, her "noncontingent, liquidated, secured debts" exceeded $1,184,200, the limit for such debts imposed in 11 U.S.C. §109(e). See 11 U.S.C. §104(a); Revision of Certain Dollar Amounts in the Bankruptcy Code, 81 Fed. Reg. 8748 (Feb. 16, 2016). Engelman objected that she is not liable on the note to York and that the mortgage is void because her signatures on those documents were forged. Excluding the debt to York, Engelman's prepetition debts are within the limits for chapter 13 debtors specified in §109(e).

I

The parties dispute substantially all of the facts material to York's motion to dismiss, so the court held a three-day evidentiary hearing in October 2019.

Before the hearing commenced, the parties stipulated to the following facts: In 2012 an attorney named Russell Reff represented York's sole member, Stephen Landolt. At Landolt's request, using figures that Landolt provided, Reff drafted the note and mortgage at issue here. Reff asked Landolt to have Engelman and her husband, Lee, who has since died, come to his office to sign the note and mortgage, but Reff was later told that Lee wanted his cousin, an attorney named Walter Bush, to review the documents first. Someone then picked up the note and mortgage from Reff's office, but Reff does not know who.

These stipulated facts are largely inconsequential: the core of the parties' dispute is, what happened after the unexecuted note and mortgage left Reff's office? Answering that question was the focus of the evidentiary hearing, and the parties presented substantially conflicting evidence with respect to the relevant facts.

In York's case-in-chief, Walter Bush and Mona Eaton, who worked for Bush in 2012, both testified that Engelman signed the promissory note to York in their presence, at Bush's office, and that they then signed as witnesses, as the note itself reflects. No one testified to seeing Engelman sign the mortgage, but Bush testified that he was on the phone with her when she signed the mortgage, she generally described the mortgage to him during that call, and he later authenticated her signature on the mortgage based on the phone call and by comparing it with exemplars of her signature that he had on file. The mortgage bears Bush's signature authenticating Engelman's signature, as well as Lee's signature.

Engelman testified, to the contrary, in her case-in-chief, that she did not sign the note or mortgage. She then called Robin Williams, a forensic handwriting analyst, to testify. Williams opined that he eliminated Engelman as the writer of the signatures

attributed to her on the note and mortgage after comparing those signatures with contemporaneous exemplars of her signature that Engelman provided.

In addition to disputing the circumstances in which the note and mortgage were executed, the parties presented virtually irreconcilable constructions of the personal and financial context in which the apparent deal arose in the first place.

In York's case-in-chief, Landolt testified as follows: Before retiring, he was a financial advisor and worked for a brokerage firm, where Engelman and Lee had an account. He first met Engelman and Lee at church in the 1980s, socialized and became good friends with them in the 1990s, and started loaning them money in the early 2000s. Lee had started a restaurant called Mr. Cinder's that was doing well, and he and Landolt had discussed possible new business ventures in which Landolt could invest. At Lee's request, Landolt started loaning Engelman and Lee money, including for a new restaurant called Kodiak Jack's. Landolt maintained his own records of the amounts he loaned and regularly applied interest on the amounts outstanding, though he never sought to profit from the arrangement. In 2012, with payments in default, Landolt agreed to consolidate the outstanding indebtedness in a single renewal note, the note at issue here. Lee suggested, and Landolt accepted, the mortgage at issue to secure repayment of the amount owed on the renewal note. Although Landolt generally dealt with Lee, he had several conversations with Engelman about her and Lee's debt to him both before and after the 2012 renewal note and mortgage were executed.

In her case-in-chief, Engelman testified, largely to the contrary, as follows: She and Lee owned some restaurants, but he ran them. She did not discuss money or loans with either Lee, who handled the finances for the businesses and the family, or Landolt, who was Lee's friend and a family friend. She went with Lee to Bush's office more than once to sign documents, but she does not remember what she signed because Lee did not let her read the documents before signing them or tell her what they were signing, other than to say at least twice that they were renewing a note. She did not know where

the money for Kodiak Jack's came from or that Landolt provided it, and Lee never told her that he had borrowed as much from Landolt as Landolt says he did. She never would have agreed to borrow so much.

Further complicating all of this, the parties dispute whether Engelman gave Lee a financial power of attorney before 2012. York offered, and the court admitted into evidence, a document dated May 26, 2010, that appears to do exactly that. Bush testified that he prepared that document, which bears his signature twice, because he both witnessed its signing and notarized it. Engelman testified that she never gave Lee a power of attorney, though she identified the signature on the document as hers.

II

Based on the documentary evidence, the testimony and demeanor of the witnesses at the evidentiary hearing, the record, and the arguments of counsel, the court makes the following findings of fact and conclusions of law. See Fed. R. Bankr. P. 7052 & 9014(c); Fed. R. Civ. P. 52(a)(1).

A

Under the circumstances, the parties' respective burdens are the same as they would be if Engelman had filed an objection to York's claim. Engelman bears the initial burden of overcoming the presumption that York's claim is valid. See Fed. R. Bankr. P. 3001(f). York bears the ultimate burden of proving that its claim is valid under applicable nonbankruptcy law. See *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 21 (2000) ("[T]he burden of proof is an essential element of the claim itself; one who asserts a claim is entitled to the burden of proof that normally comes with it."); *Capocasa v. First Nat. Bank of Stevens Point*, 154 N.W.2d 271, 274 (Wis. 1967) ("The burden of specifically proving the indebtedness secured by the mortgage is upon the mortgagee.").

B

The court first finds that Engelman did not sign either the note or the mortgage. Engelman offered, and the court admitted into evidence, several exemplars of her

signature from April and May 2012, and she identified these signatures as hers. The exemplars differ from the signatures attributed to Engelman on the note and mortgage to such a degree that they were almost certainly written by different people. The exemplars differ from the attributed signatures in several ways, including that the exemplars consistently slant to the right, while the attributed signatures remain largely upright; the end of each exemplar tends to fall below the signature line, which is not true of either attributed signature; and the shapes of the letters in the exemplars are relatively consistent, but they vary significantly from those in the attributed signatures.

The exemplars also reflect a clear tremor in Engelman's hand that she testified started between 2009 and 2014 and has only gotten worse over time. The attributed signatures seem to reflect a tremor of sorts, too, but an undeniably dissimilar (and possibly manufactured) one. That the attributed signatures are markedly smaller than the exemplars suggests that they were written by someone less affected by a fine-motor-skills impairment than Engelman was in 2012.

Robin Williams's opinion testimony, which the court allowed over York's objection, bolsters the court's conclusion that Engelman did not sign the note or the mortgage. Minimally, Williams offered nomenclature and organizing principles from the field of handwriting analysis that helped the court to structure its own observations. Still, the court's findings would be the same even if Williams had not testified.

Mona Eaton testified that Engelman signed the note in her presence. But she also testified that she drafted the note, contrary to the parties' stipulation that Russell Reff drafted both the note and the mortgage. More troubling, Eaton grew combative on the witness stand and repeatedly refused to candidly testify about an exchange that she had with Walter Bush in the courtroom gallery on the first morning of the evidentiary hearing, during which one or the other of them may have impugned Engelman's mental capacity. Due to these issues, and based on her overall demeanor as a witness, Eaton generally lacked credibility as a witness and the court disregards her testimony.

Walter Bush also testified that Engelman signed the note in his presence and further testified that Engelman described the mortgage to him over the phone before signing it. Bush's testimony was likely honest, if mistaken. His testimony about the phone call with Engelman was vague, however, and given how much time passed between the events in question and the evidentiary hearing, Bush's testimony is insufficient to overcome the compelling visual discrepancies between Engelman's exemplars and the signatures attributed to her on the note and mortgage.

C

The court next finds that Engelman's late husband, Lee, signed the note and mortgage on her behalf. Engelman testified that Lee brought her to Bush's office multiple times to sign documents, including to renew a note, though it was never clear to her what she was signing. She testified that Lee handled the businesses' and the family's finances and that she did not discuss money with him. And she testified that Lee signed documents on her behalf as the tremor in her hand worsened over time and she was less and less able to sign documents herself. The signatures attributed to Engelman on the note and mortgage, while dissimilar from her contemporaneous exemplars, resemble each other to such a degree that they were likely signed by the same hand, and given Engelman's testimony, that hand was most likely Lee's. The most reasonable inference to be drawn from the evidence is that Lee signed Engelman's name to the note and mortgage, and the court so finds.

Relatedly, the court finds that Engelman signed the 2010 document giving Lee a durable power of attorney for finances. Engelman identified her signature on that document, and the signature sufficiently resembles the exemplars of Engelman's signature from 2012 that the court infers that she signed that document herself. The one caveat, for which the court accounts, is that the tremor reflected in Engelman's 2012 signatures is not present in her 2010 signature on the durable power of attorney. This is consistent with Engelman's testimony that her tremor started during or after 2009 and

worsened over time. Her tremor may not have arisen before she signed the durable power of attorney, or it may have been intermittent or negligible at that time such that it did not manifest in her 2010 signature but consistently affected her signatures by 2012.

Engelman's only challenge to the validity of the durable power of attorney is her testimony that she never gave Lee a power of attorney. As discussed above, the evidence clearly demonstrates otherwise. Accordingly, the court concludes that the 2010 durable power of attorney was valid.

Further, Engelman does not dispute that the durable power of attorney granted Lee the authority to sign the note to York and mortgage real property on her behalf. See ECF No. 57, at 99, ¶¶5–6 (authorizing Lee to act for Engelman, including "[t]o manage real property; to sell, convey, and mortgage realty; and to execute deeds . . . and other instruments relating to realty" and "[t]o borrow money and to pledge . . . assets for loans if in the judgment of my attorney [Lee] such action is necessary"); see also *id.* at 100, ¶12 (authorizing Lee "[t]o do and perform all and every act and thing whatsoever as [Engelman] might or could do in [her] own proper person if personally present").

Engelman instead argues that Lee acted on his own and without her knowledge in carrying out transactions to which she never would have consented. At best, this suggests a claim for breach of fiduciary duty against Lee. Engelman's own testimony, however, demonstrates that the long-standing arrangement between Engelman and Lee was that, with respect to their personal finances and the finances of their businesses, he acted without consulting her, and she deferred to his judgment. Within that context, the durable power of attorney appears to be little more than a formal ratification of this arrangement, permitting Lee to transact on Engelman's behalf without involving her at all and freeing Engelman from the occasional hassle of signing paperwork, at Lee's direction, that she did not care to read anyway. Accordingly, Engelman likely could not state a cognizable claim that Lee breached his fiduciary duty to her. See *Russ ex rel. Schwartz v. Russ*, 734 N.W.2d 874, 886 (Wis. 2007) (affirming the trial court's conclusion

that an agent under a power of attorney did not violate a fiduciary duty to the principal by withdrawing funds, for the agent's own use, from a joint checking account with the principal where the transaction was consistent with the years-long arrangement between the principal and agent evinced by their conduct).

Even if Engelman could state a claim that Lee breached a fiduciary duty to her, she would only be entitled to relief from Lee. See Restatement (Third) of Agency §8.01 cmt. b (Am. Law Inst. 2006) ("An agent's breach of the agent's fiduciary obligation subjects the agent to liability to the principal."). The evidence does not suggest that Engelman can avoid the deal that Lee, acting within the scope of his actual authority under the durable power of attorney, entered into with York on their behalf.

D

The court concludes, based on the above findings, that Engelman is liable on the note to York that Lee executed on her behalf, within the scope of his actual authority under the 2010 durable power of attorney.

The court concludes, however, that the mortgage is void because it was not executed in compliance with state law governing conveyances of real property. Under Wisconsin law, a conveyance, including a mortgage, that is "signed by one purporting to act as agent for another" is "ineffective as against the purported principal . . . unless the authorizing principal is identified as such in the conveyance or in the form of signature or acknowledgment." Wis. Stat. §706.03(1m). Here, as discussed above, Lee signed the mortgage on Engelman's behalf, but the mortgage does not make clear that he signed as her agent nor does it identify her as the authorizing principal.

The result of all this is that, when Engelman filed her chapter 13 petition, she owed a noncontingent, liquidated, *unsecured* debt to York of nearly $1.4 million. That amount exceeds the limit for such debts specified in §109(e) of the Bankruptcy Code, which is only $394,725. See Revision of Certain Dollar Amounts in the Bankruptcy Code, 81 Fed. Reg. 8748. Therefore, Engelman is not eligible to "be a debtor under

chapter 13". §109(e). The court will dismiss the case after affording Engelman a brief period in which to convert it to a case under another chapter of the Bankruptcy Code.

III

For the reasons stated above, there is cause to dismiss this case and the court will so order unless Engelman promptly seeks to convert the case to another chapter of the Bankruptcy Code, if she is eligible to do so. See 11 U.S.C. §1307. If Engelman does not move to convert this case within 14 days after the date on which this decision is entered, the court will enter a dismissal order.

#####